EXHIBIT 1

Not Reported in F.Supp.2d, 2008 WL 2190957 (E.D.Pa.)
**(Cite as: 2008 WL 2190957 (E.D.Pa.))**

C
Only the Westlaw citation is currently available.

United States District Court,
E.D. Pennsylvania.
CENTER FOR INDIVIDUAL FREEDOM, Plaintiff,
v.
Thomas CORBETT, Attorney General of the Commonwealth of Pennsylvania, Defendant.

No. 07-2792.
May 5, 2008.

John F. Smith, Reed Smith LLP, Philadelphia, PA, Caleb P. Burns, Jan W. Baran, Thomas W. Kirby, Wiley, Rein & Fielding, Washington, DC, for Plaintiff.

Calvin R. Koons, J. Bart Delone, Office of the Attorney General, Harrisburg, PA, for Defendant.

**EXPLANATION AND ORDER**
ANITA B. BRODY, District Judge.
**I. Background**
**\*1** Pennsylvania campaign finance law prohibits corporations and unions from making any "expenditure in connection with the election of any candidate or for any political purpose whatever." 25 P.S. § 3253(a). An "expenditure" is money spent "for the purpose of influencing the outcome of an election." 25 P.S. § 3241(d)(1).

In July 2007, the Center for Individual Freedom ("CFIF") brought an action against Pennsylvania Attorney General Thomas Corbett ("Corbett," or the "Attorney General"), Secretary Pedro Cortes ("Cortes," or the "Secretary"), and other Commonwealth officials for a declaratory judgment that these provi-

sions were so vague and overbroad that they violated the First Amendment. A month later, the Attorney General and CFIF reached an agreement.[FN1] Their stipulation provided, in part, that

> FN1. Secretary Cortes was dismissed from the action.

25 P.S. § 3253(a) regulating any "expenditure in connection with the election of any candidate or for any political purpose whatever," and 25 P.S. § 3241(d)(1) defining "expenditure" as any spending "for the purpose of influencing the outcome of an election," are properly construed as applying only to spending for "express advocacy" as that term is defined in *Buckley* [.]
referring to *Buckley v. Valeo*, 424 U.S. 1, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976). Pl.'s Am. Mot. for Supp. Relief ("Pl.'s Mot") (Doc. # 34) Ex. A. p. 3, ¶ 1. The parties asked the Court to enter this stipulation as a stipulated judgment. On August 18, 2007, I entered the order incorporating the settlement of the declaratory judgment action.

In late October 2007, one week before the November 6, 2007 election for the Pennsylvania Supreme Court, CFIF began broadcasting a 30-second television advertisement for Maureen Lally-Green, a Superior Court Judge and candidate for Supreme Court Justice. That ad encouraged viewers to "thank" Lally-Green by signing an electronic petition on a Web site. Pl.'s Mot. Ex. B. The site's address was displayed during the final few seconds of the ad. *Id.* The ad did not mention the upcoming election, nor did it tell viewers to "elect" Lally-Green or "vote against" her competitors. *Id.*

The Commonwealth took action to block the ad on the grounds that it violated the campaign finance laws at issue, §§ 3253(a) and 3241(d)(1). On No-

Not Reported in F.Supp.2d, 2008 WL 2190957 (E.D.Pa.)
**(Cite as: 2008 WL 2190957 (E.D.Pa.))**

vember 1, 2007, Secretary Cortes sent a letter to CFIF threatening to seek an injunction prohibiting further broadcast of the ad. Pl.'s Mot. Ex. C. He wrote that the "most important[ ]" reason why the ad violates Pennsylvania campaign finance law was that, under *FEC v. Wisconsin Right to Life,* --- U.S. ----, 127 S.Ct. 2652, 168 L.Ed.2d 329 (2007) (*"WRTL"* ), the ad was "not truly an issue ad." *Id.* p. 2. CFIF responded immediately by letter, reminding Cortes that the stipulated judgment allowed the state to use §§ 3253(a) and 3241(d)(1) to regulate only those ads constituting " 'express advocacy' as that term is defined in *Buckley,"* rather than the broader swath of ads reachable under later Supreme Court cases. Pl.'s Mot. Ex. D pp. 1-2. That evening, CFIF moved for emergency relief in this Court, asking to prevent the Attorney General from regulating the Lally-Green ad. *Id.*

**\*2** On November 2, 2007, before I had a chance to conduct a hearing on CFIF's motion, Corbett and Cortes filed a complaint against CFIF in the Commonwealth Court of Pennsylvania, one of the state's intermediate appellate courts. Pl.'s Mot. Ex. E. They also moved for a preliminary injunction to prevent CFIF from continuing to air the ad. *Id.* At a hearing in Commonwealth Court held later that day, Corbett and Cortes argued that Pennsylvania campaign finance law had to be interpreted not only in light of *Buckley,* but in light of post-*Buckley* U.S. Supreme Court cases which greatly expanded the scope of permissible state regulation beyond mere "express advocacy." Pl.'s Mot. Ex. F. Again notwithstanding the stipulated judgment, Corbett and Cortes argued that *"Buckley v. Valeo* and the so-called magic words is not the be-all and end-all of Supreme Court pres[ce]dent ... We're not just looking at *Buckley v. Valeo.* We're looking at all the Supreme Court pre[ce]dent." *Id.* p. 35.

On November 2, the same day it held the hearing, the Commonwealth Court denied the motion. Pl.'s Mot. Ex. G. On December 3, 2007, CFIF moved in this Court for attorneys' fees and other forms of relief, alleging that the Commonwealth's enforcement efforts

violated the stipulated judgment because it applied §§ 3253(a) and 3241(d)(1) to more than just " 'express advocacy' as defined in *Buckley."*

## II. The Commonwealth's application of §§ 3253(a) and 3241(d) (1)

This is a case about compliance with court-ordered stipulations. The stipulated judgment settling the declaratory judgment action provided that §§ 3253(a) and 3241(d)(1) apply "only to spending for 'express advocacy as that term is defined in *Buckley."* Pl .'s Mot. Ex. A. p. 3, ¶ 1. Therefore, the Attorney General will have violated the declaratory judgment order if the Lally-Green ad is not 'express advocacy' as that term is defined in *Buckley."*

According to *Buckley,* express advocacy means "express words of advocacy of election or defeat, such as 'vote for,' 'elect,' 'support,' 'cast your ballot for,' 'Smith for Congress,' 'vote against,' 'defeat,' 'reject." 424 U.S. at 44 n. 52. Importantly, it does not include ads that advocate election or defeat without using "express words." *McConnell v. FEC,* 540 U.S. 93, 126, 206, 124 S.Ct. 619, 157 L.Ed.2d 491 (2003) (distinguishing "express advocacy" from the "functional equivalent of express advocacy" and noting that *Buckley* encompassed only the former). Further, the "express advocacy" inquiry does not incorporate considerations of the speaker's intent, the overall context of the ad, or the timing of the ad vis-a-vis an upcoming election. 424 U.S. at 43; *WRTL,* 127 S.Ct. at 2688. The issue is whether the Lally-Green ad includes "express *words* of advocacy of election or defeat." 424 U.S. at 44 n. 52 (emphasis added). The Lally-Green ad does not constitute " 'express advocacy' as that term is defined in *Buckley."*

**\*3** The Commonwealth Court ruled on precisely this issue in denying the Attorney General's motion for a preliminary injunction. It held, in its November 2, 2007 opinion, that the ad did not constitute "express advocacy." Pl.'s Mot. Ex. G. This determination was made as between CFIF and the Attorney General and

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 2190957 (E.D.Pa.)
**(Cite as: 2008 WL 2190957 (E.D.Pa.))**

Secretary. It was entered after a full and fair (albeit not protracted) hearing. And the text of the opinion does not indicate that the decision was not "sufficiently firm" to merit preclusive effect. *Henelein v. Colt Indus.,* 260 F.3d 201, 210 (3d Cir.2001) (judgment is "final" for issue-preclusive purposes if it is "sufficiently firm to be accorded conclusive effect"); *Hawksbill Sea Turtle v. FEMA,* 126 F.3d 461, 474 n. 11 (3d Cir.1997) (preliminary-injunction findings entitled to preclusive effect in certain circumstances). The Attorney General lost on this issue in Commonwealth Court and is therefore precluded from re-litigating it here. *See, e.g., Sherrock v. DaimlerChrysler,* 06-4767, 2008 U.S.App. LEXIS 282, *5-6 & n. 2, 2008 WL 63300 (3d Cir. Jan. 7, 2008) (Chagares, J.) (reciting principles of collateral estoppel applied in federal court to issue litigated in Pennsylvania state court).

Substantively, the only potential "express words" in the ad-and the only such words identified by the Attorney General-are "Thank Judge Maureen Lally-Green for protecting Pennsylvania families." Plainly, the word "thank," unlike the others in *Buckley'* s non-exhaustive list, has objectively reasonable interpretations other than solicitation of votes. Indeed, shortly after the *Buckley* opinion was issued, the en banc Second Circuit unanimously held in *FEC v. Cen. L.I. Tax Reform Cmte.,* 616 F.2d 45, 53 (2d Cir.1980) (en banc) (*"CLITRC"*), that a print ad asking readers to "thank" a readily identifiable Congressman up for re-election was not "express advocacy." That ad advocated lower taxes and less government, and it reported that 21 of that Congressman's 24 votes on certain matters had been in favor of "higher taxes and more government." 616 F.2d at 51, 51 n. 6. It instructed readers to "thank" the candidate if he changed his stance and "vote[d] for lower taxes and less government." *Id.* at 50. Nevertheless, the court unanimously found that that language did not constitute "express advocacy." CFIF discussed *CLITRC* at some length in its motion. Pl.'s Mot. 11, 15-16. Yet, Defendants do not even address the case much less attempt to distinguish it.

Also, the Attorney General's theory of enforcement of §§ 3253(a) and 3241(d)(1) in Commonwealth Court suggests that he had to rely upon more than just *Buckley* in order to regulate the ad. The state-court complaint is rife with language tracking post-*Buckley* cases that regulate speech that was untouchable using *Buckley* alone. For example, the complaint condemns the ad because it is "unquestionably designed to influence the outcome of the election" and is "intended" to influence that outcome. Pl.'s Mot. Ex. E. ¶¶ 19-20. Yet, *Buckley* does not take the speaker's intent into consideration. 424 U.S. at 42-43. Further, the complaint alleges that the ad "is the functional equivalent of an invitation to vote for or support" Lally-Green in the election. Pl.'s Mot. Ex. E. ¶ 30. But the "functional equivalent" of express advocacy-distinct from actual express advocacy-was not reachable under *Buckley* alone. *McConnell,* 540 U.S. at 126. The Attorney General confirmed its use of post-*Buckley* enforcement tactics at the Commonwealth Court injunction hearing, when he stated that *"Buckley v. Valeo* and the so-called magic words is not the be-all and end-all of Supreme Court pres [ce]dent ... We're not just looking at *Buckley v. Valeo.* We're looking at all the Supreme Court pre[ce]dent." Pl.'s Mot. Ex. F. p. 35.

**\*4** Further, the Attorney General cannot persuasively argue that the phrase in the stipulated judgment " 'express advocacy' as that term is defined in *Buckley"* actually means " 'express advocacy' as that term is defined in *Buckley* and its progeny" or " 'express advocacy' as that term is defined in *Buckley* and related cases." These qualifying words are not part of the stipulated judgment. And as the Attorney General goes to great pains to point out, stipulated judgments are to be construed according to their "precise terms," and a court cannot "impose other terms in an attempt to reconcile a [stipulated judgment] with [the court's] own conception of [the stipulated judgment's] purpose." Def.'s Resp. 9.

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 2190957 (E.D.Pa.)
**(Cite as: 2008 WL 2190957 (E.D.Pa.))**

The Attorney General also cannot argue that he failed to receive real consideration in exchange for agreeing to interpret §§ 3253(a) and 3241(d) using *Buckley* alone. The stipulation was entered to resolve a facial challenge. In a First Amendment overbreadth challenge, a statute is facially unconstitutional if it regulates a substantial amount of protected speech, even if it properly regulates some unprotected speech, as well. *City of Chicago v. Morales.* 527 U.S. 41, 52, 119 S.Ct. 1849, 144 L.Ed.2d 67 (1999). That is, in a First Amendment overbreadth challenge-unlike in other constitutional challenges-a statute may be deemed facially unconstitutional even if it is not un-constitutional in every application. The campaign finance laws at issue regulate any "expenditure in connection with the election of any candidate or for any political purpose whatever," and then define expenditure to mean money spent *"for the purpose* of influencing the outcome of an election." §§ 3253(a), 3241(d)(1) (emphasis added). But, the U.S. Supreme Court has recently explained that an intent-based approach to regulation of political speech may violate the First Amendment. *WRTL*, 127 S.Ct. at 2665-2666. The stipulated judgment let the Attorney General save (albeit subject to some modification) statutes which might otherwise have been struck down.

The Attorney General contends that, even if the Lally-Green ad does not constitute *Buckley* express advocacy, his enforcement actions do not violate the stipulated judgment because that judgment does not mention the Lally-Green ad in particular. Def.'s Resp. (Doc. # 36) 7-12. Put another way, the Attorney General argues that a judgment prohibiting a general practice (regulation of more than *Buckley* express advocacy), yet not specifically mentioning a particular act encompassed by that general practice (regulation of the Lally-Green ad), is not violated when a bound party engages in that unenumerated act. If this position were the law, a court would be required to conjure-and then list in painstaking detail-every single specific act encompassed by that practice in order to prevent its declaratory judgment from amounting to a dead letter.

Ordinary declaratory judgments would run hundreds of pages in the Federal Supplement. And, at the risk of bringing coals to Newcastle, it should be observed that this principle is not even adopted in the criminal law where penalties can include terms of imprisonment rather than mere money damages and where issues of fair notice are particularly heightened. For example, a statute prohibiting conversion need not include a list with jot-and-tittle descriptions of every possible type of theft that could be imagined. Unsurprisingly, the Attorney General has cited no binding precedent supporting this view. Indeed, the opposite position appears to prevail. *See, e.g., Morris v. Travisono,* 509 F.2d 1358 (1st Cir.1975) (unenumerated act falling withing general practice prohibited by declaratory judgment constitutes violation of declaratory judgment); *McCann v. Kerner,* 436 F.2d 1342, 1344 (7th Cir.1971) (same).

### III. Remedies for violation of court order

**\*5** CFIF seeks to re-join Secretary Cortes as a party to this action, an award of attorneys' fees, nominal damages for violation of the First Amendment, an injunction prohibiting Corbett (and Cortes, if re-joined) from violating the stipulated judgment, and a supplemental declaratoryjudgment clarifying the stipulated judgment.

### A. Re-joinder of Secretary Cortes

CFIF seeks to re-join Secretary Cortes as a party to this action. The Secretary does not contest this re-joinder. Def.'s Resp. 1 n.1. Therefore, I will order him re-joined.

### B. Attorneys' fees

CFIF seeks an award of attorneys' fees incurred in defending against the regulation of the Lally-Green ad via §§ 3253(a) and 3241(d)(1). Attorneys' fees may be assessed to any party who willfully violates a court order. *Pennsylvania v. Delaware Valley Citizens Counsel for Clean Air,* 478 U.S. 546, 561-562 n. 6, 106 S.Ct. 3088, 92 L.Ed.2d 439 (1986) (citing U.S. Supreme Court precedent going back as far as 1923).

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 2190957 (E.D.Pa.)
**(Cite as: 2008 WL 2190957 (E.D.Pa.))**

In this context, a violator acts willfully if he knows of the terms of the order and has the ability to comply. *Ranco Prods. v. Dunlap,* 776 F.2d 1135, 1139 (3d Cir.1985). The Attorney General agreed to the stipulated judgment; he certainly knew its terms. And as the Commonwealth's chief law enforcement officer, he clearly had the authority to decline to regulate the Lally-Green ad. Therefore, I will award attorneys fees.

### C. Nominal First Amendment damages

CFIF seeks an award of nominal damages for violation of its First Amendment right to broadcast the Lally-Green ad free of regulation. However, whether the Attorney General's enforcement actions violated the First Amendment is not determined simply by my holding that they violated the stipulated judgment. That constitutional question is not properly before me. I will not award any damages associated with violation of the First Amendment.

### D. Injunction and supplemental declaratory Judgment

CFIF also seeks an injunction prohibiting Corbett and Cortes from continuing to violate the stipulated judgment and further declaratory relief clarifying the stipulated judgment. However, CFIF has presented no evidence indicating that further violation is on the near horizon. That is, CFIF has presented no evidence suggesting it will incur any harm if such injunctive and declaratory relief do not issue. I will decline to invoke such drastic remedies on what is at this point scant speculation. *See Carroll v. Princess Anne,* 393 U.S. 175, 183, 89 S.Ct. 347, 21 L.Ed.2d 325 (1968) (injunction is "drastic" remedy); *Rondeau v. Mosinee Paper,* 422 U.S. 49, 60-61, 95 S.Ct. 2069, 45 L.Ed.2d 12 (1975) (injunction requires showing of irreparable harm).

### ORDER

**AND NOW,** this *5th* day of May, 2008, it is **ORDERED** that Plaintiff's Amended Motion for Supplemental Relief (Doc. # 34) is **GRANTED IN PART** and **DENIED IN PART** as follows:

1) Commonwealth Secretary Pedro Cortes is joined as a defendant in this action;

2) CFIF shall by May *19,* 2008, submit evidence of the attorneys' fees incurred in defending against the Commonwealth's regulation of the Lally-Green ad;

**\*6** 3) nominal First Amendment damages shall not be awarded;

4) an injunction shall not issue; and

5) a further declaratory judgment shall not issue.

E.D.Pa.,2008.
Center for Individual Freedom v. Corbett
Not Reported in F.Supp.2d, 2008 WL 2190957 (E.D.Pa.)

END OF DOCUMENT

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.3d ----, 2013 WL 6645428 (C.A.10 (N.M.))
**(Cite as: 2013 WL 6645428 (C.A.10 (N.M.)))**

**H**

Only the Westlaw citation is currently available.

United States Court of Appeals,
Tenth Circuit.
REPUBLICAN PARTY OF NEW MEXICO; Republican Party of Bernalillo County; Republican Party of Dona Ana County; New Mexico Turn Around; New Mexicans for Economic Recovery Pac; Harvey Yates; Rod Adair; Conrad James; Howard James Bohlander; Mark Veteto, Plaintiffs–Appellees,
v.
Gary K. KING, in his official capacity as New Mexico Attorney General; Kari E. Brandenburg; Janetta Hicks; Angela R. Pacheco, in their official capacities as District Attorneys, Defendants–Appellants.
and
Dianna J. Duran, in her official capacity as New Mexico Secretary of State; Amy Orlando, in her official capacity as District Attorney, Defendants.
State of Vermont; State of Hawaii; State of Iowa; State of Montana; State of Rhode Island; State of West Virginia, Amici Curiae.

No. 12–2015.
Dec. 18, 2013.

**Background:** Political parties, political committees, and individual donors brought action against state officials challenging constitutionality of state law prohibiting solicitation, acceptance, and making of contributions of greater than $5,000 to political committees. The United States District Court for the District of New Mexico, William P. Johnson, J., granted plaintiffs' motion for preliminary injunction. Defendants appealed.

**Holding:** The Court of Appeals, Tymkovich, Circuit Judge, held that plaintiffs were likely to succeed on merits of their claim that limits on contributions designated for independent expenditures violated First Amendment.

Affirmed.

West Headnotes

**[1] Injunction 212 ⚷1092**

212 Injunction
    212II Preliminary, Temporary, and Interlocutory Injunctions in General
        212II(B) Factors Considered in General
            212k1092 k. Grounds in general; multiple factors. Most Cited Cases

To obtain a preliminary injunction, the moving party must demonstrate: (1) a likelihood of success on the merits; (2) a likelihood that the moving party will suffer irreparable harm if the injunction is not granted; (3) the balance of equities is in the moving party's favor; and (4) the preliminary injunction is in the public interest.

**[2] Federal Courts 170B ⚷815**

170B Federal Courts
    170BVIII Courts of Appeals
        170BVIII(K) Scope, Standards, and Extent
            170BVIII(K)4 Discretion of Lower Court
                170Bk814 Injunction
                    170Bk815 k. Preliminary injunction; temporary restraining order. Most Cited Cases

Court of Appeals reviews District Court's grant of a preliminary injunction for abuse of discretion.

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.3d ----, 2013 WL 6645428 (C.A.10 (N.M.))
**(Cite as: 2013 WL 6645428 (C.A.10 (N.M.)))**

**[3] Constitutional Law 92 ☞1681**

92 Constitutional Law
   92XVIII Freedom of Speech, Expression, and
Press
     92XVIII(F) Politics and Elections
      92k1681 k. Political speech, beliefs, or
activity in general. Most Cited Cases

The First Amendment has its fullest and most urgent application to speech uttered during a campaign for political office. U.S.C.A. Const.Amend. 1.

**[4] Constitutional Law 92 ☞1681**

92 Constitutional Law
   92XVIII Freedom of Speech, Expression, and
Press
     92XVIII(F) Politics and Elections
      92k1681 k. Political speech, beliefs, or
activity in general. Most Cited Cases

Laws that burden political speech are subject to careful judicial review. U.S.C.A. Const.Amend. 1.

**[5] Constitutional Law 92 ☞1703**

92 Constitutional Law
   92XVIII Freedom of Speech, Expression, and
Press
     92XVIII(F) Politics and Elections
     92k1702 Expenditures
      92k1703 k. In general. Most Cited Cases

Expenditures for political speech are core political speech directly advancing public debate, subject to strict scrutiny. U.S.C.A. Const.Amend. 1.

**[6] Constitutional Law 92 ☞1703**

92 Constitutional Law

**92XVIII** Freedom of Speech, Expression, and
Press
     92XVIII(F) Politics and Elections
     92k1702 Expenditures
      92k1703 k. In general. Most Cited Cases

Expenditures for political speech cannot be restricted unless narrowly tailored to advance a compelling state interest. U.S.C.A. Const.Amend. 1.

**[7] Injunction 212 ☞1349**

212 Injunction
   212IV Particular Subjects of Relief
     212IV(J) Elections, Voting, and Political
Rights
      212k1349 k. Contributions and expenditures. Most Cited Cases

Political parties, political committees, and individual donors were likely to succeed on merits of their claim that provision of New Mexico Campaign Reporting Act limiting contributions designated for independent expenditures violated their First Amendment free speech and association rights, and thus were entitled to preliminary injunction barring state officials from enforcing law. U.S.C.A. Const.Amend. 1; West's NMSA § 1–19–34.7(A)(1).

**[8] Constitutional Law 92 ☞1699**

92 Constitutional Law
   92XVIII Freedom of Speech, Expression, and
Press
     92XVIII(F) Politics and Elections
     92k1697 Contributions
      92k1699 k. Limitations on amounts.
Most Cited Cases

Contribution limitations that restrict the amount any person or organization may contribute to a candidate or political committee must be closely drawn to

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.3d ----, 2013 WL 6645428 (C.A.10 (N.M.))
**(Cite as: 2013 WL 6645428 (C.A.10 (N.M.)))**

serve a sufficiently important interest, namely, the prevention of corruption or the appearance of corruption. U.S.C.A. Const.Amend. 1.

West Codenotes
Recognized as Invalid2 U.S.C.A. § 441b Phillip Baca, Assistant Attorney General (Gary K. King, Attorney General, with him on the briefs) Office of the Attorney General, Albuquerque, NM, for Appellants.

Randy Elf, James Madison Center for Free Speech, Terre Haute, Indiana (James Bopp, Jr., James Madison Center for Free Speech, Terre Haute, IN, and Paul M. Kienzle III, Scott & Kienzle, P.A., Albuquerque, NM, with him on the brief) for Appellees.

William H. Sorrell, Attorney General of Vermont, and Eve Jacobs–Carnahan, Assistant Attorney General of Vermont, Montpelier, Vermont, David M. Louie, Attorney General of Hawaii, Honolulu, HI, Steve Bullock, Attorney General of Montana, Helena, MT, Darrell V. McGraw, Jr., West Virginia Attorney General, Office of the Attorney General, Charleston, WV, Tom Miller, Attorney General of Iowa, Des Moines, IA, and Peter F. Kilmartin, Attorney General, State of Rhode Island, Providence, RI, filed an Amici brief on behalf of Appellants.

Before TYMKOVICH, McKAY, and O'BRIEN, Circuit Judges.

TYMKOVICH, Circuit Judge.
**\*1** This case requires us to consider state campaign finance regulations in light of the Supreme Court's ruling in Citizens United v. FEC, 558 U.S. 310, 130 S.Ct. 876, 175 L.Ed.2d 753 (2010). Citizens United held that federal election law violated the First Amendment by restricting independent political spending because the speaker was a corporation—the holding allowed corporate entities to make unlimited independent expenditures supporting or opposing issues or candidates as long as the expenditures were

not coordinated with a candidate for federal office.

Before the Court's decision in Citizens United in 2010, however, New Mexico had introduced a new state campaign finance law that imposed a host of contribution and other limitations on political parties, political action committees, and donors to such entities. In particular for purposes of this appeal, the state limited the amount an individual may contribute to a political committee. Potential donors, political parties, and political committees mounted an as-applied challenge to the law in federal district court, contending several of its provisions violated the First Amendment.

The district court agreed and issued a preliminary injunction, enjoining the enforcement of two provisions: (1) limits on contributions to political committees for use in federal campaigns, and (2) limits on contributions to political committees that are to be used for independent expenditures, *i.e.,* expenditures not authorized by or coordinated with a candidate or candidate committee. See Republican Party of N.M. v. King, 850 F.Supp.2d 1206, 1216 (D.N.M.2012). New Mexico appealed the latter ruling, contending that the limit on contributions furthers the state's compelling interest in preventing corruption or the appearance of corruption in campaign spending.

As we explain below, the district court was correct that the challenged provision cannot be reconciled with Citizens United and, as a result, did not err in entering a preliminary injunction.

**I. Background**
New Mexico enacted in 2009 a measure that imposed campaign contribution limits for statewide and nonstatewide elections. New Mexico's law, N.M. Stat. § 1–19–34.7, targets contributions to political committees and candidates in several ways.

The statute caps contributions from individuals to

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.3d ----, 2013 WL 6645428 (C.A.10 (N.M.))
(Cite as: 2013 WL 6645428 (C.A.10 (N.M.)))

political committees at $5,000, contributions to candidates for nonstatewide office at $2,300, and contributions to candidates for statewide office at $5,000. *Id.* § 1–19–34.7(A)(1).[FN1] The statute also prohibits accepting or soliciting a contribution that violates one of these limits. *Id.* § 1–19–34.7(C). Though "political committee" is defined broadly to include political parties, *id.* § 1–19–26(L), in this case only non-party political committees have challenged the constitutionality of the law as applied to them. Both groups want to solicit and accept contributions for independent expenditures in excess of the statutory maximum of $5,000. New Mexico defends the law on the grounds that Supreme Court precedent permits restrictions for contributions and such restrictions further the state's anti-corruption interests. The appellees contend that *Citizens United* changes the analysis and mandates the law's invalidation.

*2 The Plaintiffs—an assortment of state and local political parties, political action committees (PACs), and individuals—contend that these campaign finance provisions are unconstitutional as applied to them. The challengers include both state and local party organizations: the Republican Party of New Mexico (NM–GOP), the Republican Party of Dona Ana County, and the Republican Party of Bernalillo County. The PACs include the New Mexicans for Economic Recovery Political Action Committee (NMER) and New Mexico Turn Around (NMTA), two entities organized to engage in express advocacy. NMER is registered as a political committee with the New Mexico Secretary of State. Its stated purpose is to make independent expenditures but not contributions to candidates' campaigns. NMTA has a broader purpose: to make both independent expenditures and contributions to candidates' campaigns.

Claiming an infringement on their First Amendment right to engage in protected political speech, the organizations sought in district court a preliminary injunction. The district court ultimately enjoined two provisions but only one is on appeal: a provision

which prevents individuals from making contributions to political committees in excess of $5,000. N.M. Stat. § 1–19–34.7(A)(1). In enjoining the enforcement of this provision, the district court found that under *Citizens United,* the Supreme Court held there was no anti-corruption interest in limiting independent *expenditures.* Consequently, the court concluded, as has nearly every circuit court since *Citizens United,* there could be no anti-corruption interest in limiting *contributions* to be used for such expenditures. The district court also reasoned that even if NMER and NMTA had interests closely aligned with a political party, this alignment would not change the analysis because, under Supreme Court precedent, political parties could also make unlimited independent expenditures. And as long as funds contributed to NMTA for independent expenditures were kept segregated from funds that would be given to candidates, the statute could not restrict those contributions.

New Mexico timely appealed the district court's grant of the preliminary injunction, and we exercise jurisdiction under 28 U.S.C. § 1292(a)(1).

## II. Analysis

[1][2] To obtain a preliminary injunction the moving party must demonstrate: (1) a likelihood of success on the merits; (2) a likelihood that the moving party will suffer irreparable harm if the injunction is not granted; (3) the balance of equities is in the moving party's favor; and (4) the preliminary injunction is in the public interest. *Winter v. NRDC, Inc.,* 555 U.S. 7, 20, 129 S.Ct. 365, 172 L.Ed.2d 249 (2008). We review the grant of a preliminary injunction for abuse of discretion. *RoDa Drilling Co. v. Siegal,* 552 F.3d 1203, 1208 (10th Cir.2009).

This appeal centers on the first prong, the plaintiffs' likelihood of success on the merits.

### A. Legal Framework—Campaign Finance Regulation

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.3d ----, 2013 WL 6645428 (C.A.10 (N.M.))
**(Cite as: 2013 WL 6645428 (C.A.10 (N.M.)))**

**\*3** [3] The First Amendment "has its fullest and most urgent application to speech uttered during a campaign for political office." *Ariz. Free Enter. Club's Freedom Club PAC v. Bennett,* —— U.S. ——, 131 S.Ct. 2806, 2817, 180 L.Ed.2d 664 (2011) (internal quotation marks omitted). A "major purpose of the First Amendment was to protect the free discussion of governmental affairs" especially of candidates and their beliefs and performance. *Id.* at 2828. And as the Supreme Court explained in its seminal campaign regulation decision, *Buckley v. Valeo,* 424 U.S. 1, 14, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976) (per curiam), political speech is the lifeblood of democracy—it is the means by which citizens learn about candidates, hold their leaders accountable, and debate the issues of the day.

[4] But speech comes in many forms, and the Supreme Court in *Buckley* recognized that the financing and spending necessary to enable political speech receives substantial constitutional protection. *See id.* at 19, 96 S.Ct. 612. In fact, the Court observed that restrictions on money spent on speech are the equivalent of restrictions on speech itself: "A restriction on the amount of money a person or group can spend on political communication during a campaign necessarily reduces the quantity of expression by restricting the number of issues discussed, the depth of their exploration, and the size of the audience reached." *Id.* For these reasons, laws that burden political speech are subject to careful judicial review.

[5][6] *Buckley* was careful to draw a distinction between limitations on *expenditures* for political speech and limitations on *contributions* to candidates. "[W]e have understood that limits on political expenditures deserve closer scrutiny than restrictions on political contributions." *FEC v. Colo. Republican Fed. Campaign Comm. (Colorado II),* 533 U.S. 431, 440, 121 S.Ct. 2351, 150 L.Ed.2d 461 (2001). Expenditures are core political speech directly advancing public debate, subject to strict scrutiny. Expenditures cannot be restricted unless narrowly tailored to advance a

compelling state interest. *See FEC v. Wis. Right to Life,* 551 U.S. 449, 464, 127 S.Ct. 2652, 168 L.Ed.2d 329 (2007).

By contrast, contribution limitations that restrict "the amount that any one person or group may contribute to a candidate or political committee entail [ ] only a marginal restriction upon the contributor's ability to engage in free communication." *Buckley,* 424 U.S. at 20–21, 96 S.Ct. 612. A contribution only "serves as a general expression of support for the candidate and his views," and the quantity of the contribution does not significantly affect this political communication. *Id.* But such limitations still implicate core First Amendment rights. *See Citizens Against Rent Control v. City of Berkeley,* 454 U.S. 290, 299, 102 S.Ct. 434, 70 L.Ed.2d 492 (1981) ( "Placing limits on contributions which in turn limit expenditures plainly impairs freedom of expression."). Thus, while not subject to strict scrutiny, contribution limits still involve a "significant interference with associational rights" and "must be closely drawn to serve a sufficiently important interest." *Davis v. FEC,* 554 U.S. 724, 740 n. 7, 128 S.Ct. 2759, 171 L.Ed.2d 737 (2008); *Buckley,* 424 U.S. at 25, 96 S.Ct. 612.[FN2]

**\*4** Contributions can come in several forms. In addition to direct contributions to candidates, for example, expenditures coordinated with a candidate are seen as indirect contributions, since they amount to nothing more than spending by the candidate himself. *Id.* at 46 n. 53, 96 S.Ct. 612. The Court has also upheld limits on contributions to political committees that make multiple contributions to candidates, limits on contributions to political parties, and restrictions on political parties' coordinated expenditures with their candidates. *See Cal. Med. Ass'n v. FEC,* 453 U.S. 182, 101 S.Ct. 2712, 69 L.Ed.2d 567 (1981) *(Cal–Med )* (multi-candidate political committees); *McConnell v. FEC,* 540 U.S. 93, 124 S.Ct. 619, 157 L.Ed.2d 491 (2003) (contributions to political parties), *overruled in part by Citizens United,* 558 U.S. at 365–66, 130 S.Ct. 876; *Colorado II,* 533 U.S. at 465, 121 S.Ct. 2351

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.3d ----, 2013 WL 6645428 (C.A.10 (N.M.))
**(Cite as: 2013 WL 6645428 (C.A.10 (N.M.)))**

(coordinated expenditures by political parties).

But ever since *Buckley,* the Court has struck down limits on independent expenditures, *i.e.,* those that are not coordinated with candidates. The Court's rationale has been that independent expenditures by individuals do not pose the same risks as direct contributions. 424 U.S. at 47–48, 96 S.Ct. 612. And in a series of cases since *Buckley* the Court has repeatedly struck down limits on the independent expenditures by political parties, political action committees, unions, and corporations. *See Colo. Republican Fed. Campaign Comm. v. FEC (Colorado I),* 518 U.S. 604, 618, 116 S.Ct. 2309, 135 L.Ed.2d 795 (1996) (political parties); *FEC v. Nat'l Conservative PAC (NCPAC),* 470 U.S. 480, 105 S.Ct. 1459, 84 L.Ed.2d 455 (1985) (political action committees); *Citizens United,* 558 U.S. at 365, 130 S.Ct. 876 (unions and corporations); *First Nat'l Bank of Boston v. Bellotti,* 435 U.S. 765, 795, 98 S.Ct. 1407, 55 L.Ed.2d 707 (1978) (corporations).

The *Buckley* framework, importantly, recognizes only a narrow governmental interest in regulating political speech—preventing corruption or the appearance of corruption. When *Buckley* "identified a sufficiently important governmental interest in preventing corruption or the appearance of corruption, that interest was limited to *quid pro quo* corruption." *Citizens United,* 558 U.S. at 359, 130 S.Ct. 876. "The hallmark of corruption is the financial *quid pro quo:* dollars for political favors." *NCPAC,* 470 U.S. at 497, 105 S.Ct. 1459.

*Citizens United* stepped into a long-running debate over what other governmental interests might satisfy the government's regulatory interest in political speech. In that case, Citizens United, a non-profit corporation, produced a documentary highly critical of Hillary Clinton, then a presidential candidate in the 2008 Democratic primaries. 558 U.S. at 319–20, 130 S.Ct. 876. Because the movie's strong criticism of Clinton's candidacy, Citizens United worried the FEC might deem the movie an "electioneering communi-

cation," which, under 2 U.S.C. § 441b, corporations and unions were prohibited from making. An electioneering communication was defined by federal law as "any broadcast, cable, or satellite communication" that "refers to a clearly identified candidate for Federal office" and was made within sixty days of a general election or thirty days of a primary election. 2 U.S.C. § 434(f)(3)(A). The FEC regulation further defined an "electioneering communication" as one that was "publicly distributed." 11 C.F.R. § 100.29. Citizens United sought declaratory and injunctive relief against the FEC, arguing that § 441b was unconstitutional as applied to its movie.

**\*5** The Supreme Court struck down § 441b. The Court held that independent expenditures could not be restricted merely because of the corporate identity of the speaker. In doing so, the Court overruled *Austin v. Michigan Chamber of Commerce,* 494 U.S. 652, 110 S.Ct. 1391, 108 L.Ed.2d 652 (1990), a plurality opinion which had held that restrictions on political speech by corporations furthered a permissible governmental interest in reducing the distorting financial influence of business corporations on the political process. The Court rejected *Austin*'s application of a broad anti-distortion rationale to support campaign finance restrictions and held that the only valid interest for restricting political speech was preventing *quid pro quo* corruption. *Citizens United,* 558 U.S. at 359, 130 S.Ct. 876. "The absence of prearrangement and coordination of an expenditure with the candidate or his agent not only undermines the value of the expenditure to the candidate, but also alleviates the danger that expenditures will be given as a *quid pro quo* for improper commitments from the candidate." *Id.* at 357, 130 S.Ct. 876 (quoting *Buckley,* 424 U.S. at 47, 96 S.Ct. 612).

*Citizens United* thus resolved a longstanding debate over whether other governmental interests could support restrictions on campaign financing.[FN3] "Over time, various other justifications for restricting political speech have been offered—equalization of

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.3d ----, 2013 WL 6645428 (C.A.10 (N.M.))
**(Cite as: 2013 WL 6645428 (C.A.10 (N.M.)))**

viewpoints, combating distortion, leveling electoral opportunity, encouraging the use of public financing, and reducing the appearance of favoritism and undue political access or influence—but the Court has repudiated them all. As such, after *Citizens United* there is no valid governmental interest sufficient to justify imposing limits on fundraising by independent-expenditure organizations." *Wis. Right to Life State PAC v. Barland,* 664 F.3d 139, 153–54 (7th Cir.2011) (citations omitted).

*Citizens United* also opened the playing field for independent expenditures by non-profit corporations. After *Citizens United,* the Court no longer perceives a "threat of quid pro quo corruption"

> when independent groups spend money on political speech. By definition, an independent expenditure is political speech presented to the electorate that is not coordinated with a candidate. The separation between candidates and independent expenditure groups negates the possibility that independent expenditures will result in the sort of *quid pro quo* corruption with which [the Court's] case law is concerned. In short, the candidate-funding circuit is broken. *Citizens United* thus held as a categorical matter that independent expenditures do not lead to, or create the appearance of, *quid pro quo* corruption.

> *Id.* at 153 (internal quotation marks omitted).

It is worth repeating: the Court firmly rejected the contention that independent expenditures give rise to corruption or the appearance of corruption. "The appearance of influence or access ... will not cause the electorate to lose faith in our democracy. By definition, an independent expenditure is political speech ... not coordinated with a candidate." *Citizens United,* 558 U.S. at 360, 130 S.Ct. 876. And, in any event, as the Court saw it, "[i]ngratiation and access ... are not corruption," *id.,* since "[f]avoritism and influence are

not ... avoidable in representative politics. It is in the nature of an elected representative to favor certain policies, and, by necessary corollary, to favor the voters and contributors who support those policies." *Id.* at 359, 130 S.Ct. 876 (quoting *McConnell,* 540 U.S. at 297, 124 S.Ct. 619 (Kennedy, J., concurring in part and dissenting in part)).

**\*6** In sum, *Citizens United* resolved the right of a non-profit corporation to make independent expenditures without limits as to their source and amount. In its wake, the circuit courts have also uniformly struck down limitations on *contributions* to entities engaged in independent expenditures. Those cases are relevant to our conclusion here.

In the first decision analyzing contribution limitations following *Citizens United,* the D.C. Circuit found unconstitutional the Bipartisan Campaign Reform Act's contribution limits as applied to an independent expenditure-only group. *SpeechNow.org v. FEC,* 599 F.3d 686 (D.C.Cir.2010). Recognizing the government's anti-corruption interest as the only legitimate basis for limiting contributions, the D.C. Circuit reasoned that "because *Citizens United* holds that independent expenditures do not corrupt or give the appearance of corruption as a matter of law, then the government can have no anti-corruption interest in limiting contributions to independent expenditure-only organizations." *Id.* at 696. The court rejected the argument that independent expenditures "lead to preferential access for donors and undue influence over officeholders," because, following *Citizens United,* "ingratiation and access ... are not corruption." *Id.* at 694 (alteration omitted). In response, the FEC argued that *Citizens United* did not unsettle *Buckley's* decision upholding contribution limits. *Buckley,* however, concerned only direct contributions to candidates. The court reasoned that although limits on direct contributions to candidates may prevent *quid pro quo* corruption, limits on contributions for the purpose of making independent expenditures promote no anti-corruption interest. *Id.*

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.3d ----, 2013 WL 6645428 (C.A.10 (N.M.))
**(Cite as: 2013 WL 6645428 (C.A.10 (N.M.)))**

Five other circuits have also struck down contribution limits to independent expenditure groups. *See N.Y. Progress & Prot. PAC v. Walsh,* 733 F.3d 483, 487 (2d Cir.2013) (holding that an aggregate limit on an individual's contributions is unconstitutional as applied to contributions to groups for independent expenditures); *Texans for Free Enter. v. Tex. Ethics Comm'n,* 732 F.3d 535, 538 (5th Cir.2013) (holding that a state law ban on corporate contributions cannot be applied to independent expenditure committees); *Farris v. Seabrook,* 677 F.3d 858, 867 (9th Cir.2012) (concluding there was no state interest limiting contributions to independent recall committees at $800); *Thalheimer v. City of San Diego,* 645 F.3d 1109, 1121 (9th Cir.2011) (concluding, in affirming grant of preliminary injunction, that local ordinance capping contributions to independent expenditure committees at $500 violated First Amendment); *Long Beach Area Chamber of Commerce v. City of Long Beach,* 603 F.3d 684, 698–99 (9th Cir.2010) (holding that local ordinance restricting contributions cannot be applied to political action committee seeking to use funds for independent expenditures); *Barland,* 664 F.3d at 155 (holding that state law restricting contributions at $10,000 cannot be applied to independent expenditure committees); *N.C. Right to Life, Inc. v. Leake,* 525 F.3d 274, 293 (4th Cir.2008) (holding unconstitutional a state law limiting contributions to $4,000 as applied to independent expenditure committees).[FN4]

**\*7** With this framework, we turn to New Mexico's regulations.

**B. Application**

[7] *Citizens United* governs the outcome in this case. Because there is no corruption interest in limiting independent expenditures, there can also be no interest in limiting contributions to non-party entities that make independent expenditures. If an entity can fund unlimited political speech on its own without raising the threat of corruption, no threat arises from contributions that create the fund. As every other

circuit to consider the issue has recognized, *quid pro quo* corruption no longer justifies restrictions on uncoordinated spending for independent expenditure-only entities, and the absence of a corruption interest breaks any justification for restrictions on contributions for that purpose. Consequently, as the district court found, NMER is likely to succeed on the merits of its First Amendment challenges to New Mexico's law.

The district court also found in favor of NMTA, which would like to make both candidate contributions *and* independent expenditures. New Mexico's arguments require more consideration. But in the end, as we explain, the difference does not materially change our conclusions in light of *Citizens United.* Any anti-corruption interest posed by candidate contributions are resolved by the limitation on those contributions—NMTA's direct contributions to candidates are limited to $10,000 per election cycle. No such interest is met by limitations on its independent expenditures as long as there is no coordination with candidates. In short, New Mexico should be satisfied that its $10,000 per election cycle limitation averts corruption or its appearance, and thus has no further interest in limiting contributions intended for independent expenditures.

In an instructive case, the D.C. Circuit addressed the situation where a PAC made independent expenditures and contributed to individual candidates. *Emily's List v. FEC,* 581 F.3d 1 (D.C.Cir.2009). The court explained that a PAC that makes independent expenditures "does not suddenly forfeit its First Amendment rights when it decides also to make direct contributions to parties or candidates." *Id.* at 12. The court noted the PAC merely needs to ensure that its contributions to parties or candidates come from an account set up for that purpose, not one used for independent expenditures. *Id.* Applying these principles, the court found unconstitutional regulations requiring Emily's List to use a portion of its limited "hard-money" funds (those given directly to

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.3d ----, 2013 WL 6645428 (C.A.10 (N.M.))
**(Cite as: 2013 WL 6645428 (C.A.10 (N.M.)))**

candidates) for advertisements, get-out-the-vote ef-
forts, and voter registration drives. *Id.* at 16. In other
words, the PAC had the right to raise unlimited funds
for independent spending and could not be forced to
fund portions of their independent activities from their
hard-money accounts (for which contributions were
limited to $5,000). *Id.* The FEC did not petition the
Supreme Court for certiorari and ultimately withdrew
the challenged regulations. *See* 11 C.F.R. § 106.6(c),
(f), *reversed by* 75 Fed.Reg. 13223 (Mar. 19, 2010).

In this case, NMTA is similarly situated. It makes
both independent expenditures and candidate contri-
butions. It maintains separate accounts for these pur-
poses and, under the record we have, adheres to con-
tribution limits for donations to its candidate account.
In these circumstances, under the logic of *Citizens
United,* no anti-corruption interest is furthered as long
as the NMTA maintains an account segregated from
its candidate contributions. *See Carey v. FEC,* 791
F.Supp.2d 121, 131–32 (D.D.C.2011) (concluding
that maintaining separate accounts for direct contri-
butions and for independent expenditures satisfies
federal law). Because NMTA maintains such a seg-
regated account, it does not run afoul of candidate
contribution restrictions.

**\*8** New Mexico puts forward two main coun-
ter-arguments: (1) it points to Supreme Court prece-
dent prior to *Citizens United* that, it contends, supports
limits on contributions for independent expenditures;
and (2) the state's interest in preventing circumvention
of valid contribution limits is a compelling interest
even after *Citizens United.*

In support of its first argument, New Mexico
points to *Buckley, Cal–Med, Colorado I,* and
*McConnell.* Yet every one of those cases concerns
contributions to entities different than those at issue
here, and none supports its argument.

In *Buckley,* the Court upheld contribution limits

to candidates but struck down limits on expenditures.
One of the contribution limits the Court upheld was
the $25,000 aggregate limit on contributions to can-
didates and political committees. 424 U.S. at 38, 96
S.Ct. 612. But the Court was not addressing contribu-
tions to political committees for independent expend-
itures, only contributions to "political committees
likely to contribute to [a particular] candidate." *Id.* The
concern was that the absence of an aggregate cap
would facilitate "evasion of the $1,000 contribution
limitation." *Id.* In other words, a donor could make
numerous contributions to different PACs likely to
make contributions to the favored candidate and
thereby evade the individual limits on contributions to
candidates. The aggregate limitation served a justifi-
able limit on a donor's ability to contribute dollars
directly to a candidate, either personally or through a
PAC.[FN5]

Similarly, in *Cal–Med,* the Supreme Court reaf-
firmed contribution limits to multi-candidate political
committees, *i.e.,* PACs that made campaign contribu-
tions to multiple candidates. The Court reasoned, as in
*Buckley,* Congress could restrict contributions to such
committees or else individuals could circumvent the
$1,000 limit on individual contributions and the
$25,000 aggregate limit. 453 U.S. at 197–99, 101
S.Ct. 2712. In the opinion, however, there was no
discussion, let alone approval, of contribution re-
strictions for independent expenditures. In fact, Justice
Blackmun, in his concurring (and controlling) opin-
ion, underscored that "a different result would follow
if [the restrictions] were applied to contributions to a
political committee established for the purpose of
making *independent* expenditures, rather than con-
tributions to candidates." *Id.* at 203, 101 S.Ct. 2712
(Blackmun, J., concurring) (emphasis added).

In the next case New Mexico identifies, *Colorado
I,* the Supreme Court addressed independent
expenditure limits on political parties. The Court held
that Congress could not limit the uncoordinated ex-
penditures of political parties, but the principal opin-

--- F.3d ----, 2013 WL 6645428 (C.A.10 (N.M.))
(Cite as: 2013 WL 6645428 (C.A.10 (N.M.)))

ion noted that contributions to parties may pose a threat of corruption because they enable independent party expenditures to benefit a particular candidate. *Colorado I,* 518 U.S. at 617, 116 S.Ct. 2309.

The Court made clear in *McConnell,* however, that the government could limit contributions to parties because of their inherent connection to and close affiliation with their candidate standard-bearers. In *McConnell,* the Court upheld limits on soft-money contributions to political parties—funds used for issue advocacy and get-out-the-vote efforts. The Court held that "contributions to a federal candidate's party in aid of that candidate's campaign threaten to create—no less than would a direct contribution to the candidate—a sense of obligation." *McConnell,* 540 U.S. at 144, 124 S.Ct. 619. "This is particularly true of contributions to national parties, with which federal candidates and officeholders enjoy a special relationship and unity of interest." *Id.* at 145, 124 S.Ct. 619.

**\*9** *McConnell* demonstrates the Court's belief that political parties are so inherently affiliated with candidates to justify a presumption that money a contributor might give to a party will be spent on that candidate, thereby evading the candidate contribution limits. But neither *Colorado I* nor *McConnell* has anything to say about contributions to political entities unaffiliated with candidates or parties. And given *Citizens United,* there can be no similar concern with contributions for independent expenditures by an entity unaffiliated with a candidate.

Drilling deeply into *McConnell,* New Mexico further argues that one footnote—footnote 48—should be read as justifying restrictions on contributions to non-party political committees. The footnote discusses the Court's holding in *Cal–Med,* which as we have explained, upheld contributions limitations to multi-candidate PACs to implement the $1,000 cap on contributions to particular candidates and the $25,000 combined cap on contributions to all candidates.[FN6] New Mexico claims the footnote ex-

pands *Cal–Med* not just to prevent the circumvention of aggregate contribution limits to candidates but also to limit independent expenditures.

Yet there is good reason this interpretation is misplaced. As noted above, Justice Blackmun in his concurring opinion in *Cal–Med* stated that his decision to uphold the limit on contributions would be different if the restrictions "were applied to contributions to a political committee established for the purpose of making independent expenditures, rather than contributions to candidates." *Cal–Med,* 453 U.S. at 203, 101 S.Ct. 2712 (Blackmun, J., concurring). In other words, Justice Blackmun concluded "that contributions to political committees can be limited *only if* those contributions implicate the governmental interest in preventing actual or potential corruption." *Id.* (emphasis added). And Justice Blackmun was the fifth vote upholding the statute, and thus his more narrow view of the Court's holding is controlling. *See Marks v. United States,* 430 U.S. 188, 193, 97 S.Ct. 990, 51 L.Ed.2d 260 (1977) ("[T]he holding of the Court may be viewed as that position taken by those Members who concurred in the judgments on the narrowest grounds."). Absent strong evidence to the contrary, it is unlikely that the *McConnell* Court meant to expand the narrow holding of *Cal–Med.*

The *McConnell* Court's analysis, moreover, was primarily aimed at the soft-money activities of *parties,* namely, Congress's concern that parties acted as "pass-throughs" because of their natural affiliation with the party's candidates. *McConnell,* 540 U.S. at 152 n. 48, 124 S.Ct. 619. But groups that do not share a party relationship are treated differently. The Court noted that "[i]nterest groups ... remain free to raise soft money" and affirmed Congress's recognition of the "real-world differences between political parties and interest groups when creating a system of campaign finance." *Id.* at 188, 124 S.Ct. 619. These comments reflect the Court's acceptance of the analytical differences between parties and independent expenditure groups for purposes of First Amendment protection:

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.3d ----, 2013 WL 6645428 (C.A.10 (N.M.))
(Cite as: 2013 WL 6645428 (C.A.10 (N.M.)))

more onerous contribution restrictions may be placed on political parties than on independent groups. At most, what *McConnell*'s reliance on *Cal–Med* stands for is that political parties have a close enough relationship with candidates such that Congress can justifiably restrict contributions to parties—in ways that go beyond merely preventing the circumvention of contribution limits to candidates. In that case, it meant soft-money to parties was an appropriate target. But there is no analog here for independent political committees. As one court explained, it is "not an exaggeration to say that *McConnell* views political parties as different in kind than independent expenditure committees." *N.C. Right to Life,* 525 F.3d at 293.

**\*10** New Mexico's reading of footnote 48 is also inconsistent with the holding of *Citizens United.* The holding in *McConnell* suggested that it is proper to evaluate a donation or expenditure's "potential impact on a candidate's election" or "value to the candidate" when assessing the potential for actual or apparent corruption. 540 U.S. at 152, 124 S.Ct. 619. This discussion and footnote 48 were responses to Justice Kennedy's narrower and "crabbed view of corruption," *id.*—a view that the Supreme Court (per Justice Kennedy now in the majority) expressly adopted in *Citizens United* as the only justification for campaign finance restrictions. *Citizens United* affirmed that government can restrict campaign financing only to prevent actual or apparent *quid pro quo* corruption. To the extent that footnote 48 rests on the assumption that the government may restrict speech for any reason besides the prevention of actual or apparent *quid pro quo* corruption, New Mexico's reading is foreclosed by *Citizens United.*[FN7]

One district court suggested that even if limits on contributions to independent expenditure-only PACs are unconstitutional, hybrid PACs that make both independent expenditures and contributions to candidates may implicate the government's anti-corruption interest. In *Stop This Insanity, Inc. Employee Leadership Fund v. FEC,* 902 F.Supp.2d 23

(D.D.C.2012), the court held that a hybrid PAC's use of separate bank accounts for campaign contributions and independent expenditures was insufficient to overcome the appearance of corruption that exists when a single entity conducts both activities. In so holding, the court disagreed with another judge in the district, *see Carey,* 791 F.Supp.2d at 131–32, and more directly with the D.C. Circuit's holding in *Emily's List,* 581 F.3d at 12.

*Stop This Insanity* does not offer a compelling rationale why combining two activities, neither of which by itself is corrupting, into a single entity suddenly increases the risk of real or apparent *quid pro quo corruption.* The court asserted that a PAC's direct contribution compromises, or at least appears to compromise, the independence of its express advocacy. *See id.* But a direct contribution is not an example of the type of coordination that implicates a PAC's independent advocacy. In *Citizens United,* the Court held that independent expenditures are by definition uncoordinated with candidates and cannot lead to the appearance of *quid pro quo* corruption. 558 U.S. at 360, 130 S.Ct. 876.[FN8] A hybrid PAC's direct contribution does not alter the uncoordinated nature of its *independent expenditures;* there still must be some attendant coordination with the candidate or political party to make corruption real or apparent.[FN9] In any event, a hybrid PAC must respect both direct contribution limits and anti-coordination laws. These measures satisfy the government's anti-corruption interest with respect to hybrid PACs.[FN10]

**\*11** Finally, New Mexico contends that its anti-circumvention rationale justifies the contribution limits. *See Colorado II,* 533 U.S. at 456, 121 S.Ct. 2351 ("[A]ll members of the Court agree that circumvention is a valid theory of corruption."). New Mexico argues the threat of circumvention gives the state the authority to restrict contributions and expenditures that are not directly corrupting but may facilitate the evasion of other valid limits. Yet there can be no freestanding anti-circumvention interest. As

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.3d ----, 2013 WL 6645428 (C.A.10 (N.M.))
**(Cite as: 2013 WL 6645428 (C.A.10 (N.M.)))**

*Cal–Med* and *Colorado II* indicate, there must be an underlying risk of corruption that justifies a contribution limit, and there must be a real possibility of evading those valid limits through unlimited contributions. Here, there is no underlying risk of corruption since NMTA's contributions to candidates are controlled and any independent expenditures are not corrupting. *Citizens United,* 558 U.S. at 360, 130 S.Ct. 876. As long as the PAC does not pass along the donors' funds to candidates or coordinate with candidates in making expenditures, there is no possibility that unlimited contributions for independent expenditures will enable donors to skirt otherwise valid contribution limits.[FN11]

As a fallback argument, New Mexico has suggested both here and below that NMER and NMTA are not really independent of the Republican Party of New Mexico, due to overlapping membership between the leadership of the PACs and that of the state and local branches of the Republican Party. *See* Aplt. Br. at 9; Aplt.App. 129–30. The district court rejected these concerns: "Since political parties legally can make independent expenditures, the mere fact that NMER and NMTA are closely related to political parties does not affect the analysis regarding their ability to make independent expenditures." Aplt.App. 299.

We agree, but with this caveat. While it is true that political parties can make unlimited independent expenditures, *see Colorado I,* 518 U.S. at 618, 116 S.Ct. 2309, the Supreme Court in *McConnell* upheld restrictions on soft-money contributions to political parties—funds not passed along to candidates' campaigns but used for a party's general operating costs, get-out-the-vote drives, and issue advocacy. And *McConnell* supports limits like those in BCRA that restrict soft-money contributions to political parties. *See McConnell,* 540 U.S. at 145, 124 S.Ct. 619 (noting that an "ample record in these cases" supported the congressional finding that soft-money contributions to national party committees have "a corrupting influ-

ence").

The difference between this case and *McConnell,* however, is that New Mexico's definition of a "political committee" includes both political parties and nonparty political committees. N.M. Stat. § 1–19–26(L). A state political party, due to *McConnell,* is much less likely to bring a successful as-applied challenge to a limitation on the contributions it may receive, particularly if there was record evidence of state or local "parties hav[ing] *sold* access" to candidates. 540 U.S. at 153, 124 S.Ct. 619 (emphasis in original); *see also Republican Nat'l Comm. v. FEC,* 698 F.Supp.2d 150 (D.D.C.2010) (three-judge panel) (applying *McConnell,* post- *Citizens United,* to uphold federal ban on unlimited soft-money to state and local parties).

***12** While the record suggests that there is some overlapping leadership,[FN12] the question before us is whether political committees that are not formally affiliated with a political party or candidate may receive unlimited contributions for independent expenditures. On this question the answer is yes.

If the political committees are indirectly controlled by political parties, that would raise a separate issue—coordination. Though this question is not before us, we note that the Supreme Court has long upheld provisions which designate coordinated expenditures as indirect contributions. *See Colorado II,* 533 U.S. at 464–65, 121 S.Ct. 2351; *Buckley,* 424 U.S. at 46 & n. 53, 96 S.Ct. 612. If a PAC were making expenditures that were coordinated with a political party, then such expenditures could be deemed contributions to a political party. And those contributions would be subject to whatever limitations that are still valid under *McConnell.* If New Mexico believes that there is improper coordination between a PAC and a state or local political party, then it could bring an enforcement action. But the record at the preliminary injunction stage does not disclose any unlawful coordination, nor did the parties adequately brief the issue

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.3d ----, 2013 WL 6645428 (C.A.10 (N.M.))
**(Cite as: 2013 WL 6645428 (C.A.10 (N.M.)))**

on appeal or below.

[8] In sum, contribution limits must be "closely drawn" to serve "a sufficiently important interest," namely, the prevention of corruption or the appearance of corruption. The Supreme Court has held that independent expenditures do not invoke the anti-corruption rationale, and New Mexico does not differentiate between contributions for independent expenditures and contributions for candidate contributions. We therefore conclude that NMER and NMTA have satisfied their showing of likelihood of success that N.M. Stat. § 1–19–34.7(A)(1) is unconstitutional as applied to contributions to those organizations to be used solely for independent expenditures.

### III. Conclusion

Because NMER and NMTA are likely to prevail on the merits in their challenge against New Mexico's law, we AFFIRM the district court's grant of a preliminary injunction enjoining the law's enforcement.

FN1. The relevant section of the statute is as follows:

A. The following contributions by the following persons are prohibited: (1) from a person, not including a political committee, to a:

(a) ....

(b) ....

(c) political committee in an amount that will cause that person's total contributions to the political committee to exceed five thousand dollars ($5,000) during a primary election or five thousand dollars ($5,000) during a general election N.M. Stat. § 1–19–34.7.

FN2. Some Justices have expressed disagreement with *Buckley*'s application of a lower level of scrutiny to contribution limits. *See, e.g., Randall v. Sorrell,* 548 U.S. 230, 265–73, 126 S.Ct. 2479, 165 L.Ed.2d 482 (2006) (Thomas, J., concurring). And Justice Stevens even rejected the notion of money as speech by proxy, *see Nixon v. Shrink Mo. Gov't PAC,* 528 U.S. 377, 398–99, 120 S.Ct. 897, 145 L.Ed.2d 886 (2000) (Stevens, J., concurring), suggesting an even lower level of scrutiny for campaign regulations. We need not weigh in on the proper level of scrutiny for contribution limits, because in the wake of *Citizens United,* limits on contributions to PACs for the purpose of making independent expenditures are unconstitutional even under a lower level of scrutiny.

FN3. Disclosure and disclaimer requirements, on the other hand, are subject to "exacting scrutiny" and may be upheld if there is "a 'substantial relation' between the disclosure requirement and a 'sufficiently important governmental interest' "—namely, opening up information to the public. *Citizens United,* 558 U.S. at 366–67, 130 S.Ct. 876 (quoting *Buckley,* 424 U.S. at 64, 66, 96 S.Ct. 612). The Court upheld disclosure requirements at issue in *Citizens United* because they provided the electorate with information about the identity of the speaker and did not impose a chill on political speech, even for independent expenditures.

FN4. The Eleventh Circuit in an unpublished opinion declined to hold unconstitutional limits on PAC–to–PAC contributions for the purpose of independent expenditures. *See Alabama Democratic Conference v. Broussard,* Fed.Appx. 5273304, 2013 WL 5273304 (11th Cir. Sept. 19, 2013). The

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.3d ----, 2013 WL 6645428 (C.A.10 (N.M.))
**(Cite as: 2013 WL 6645428 (C.A.10 (N.M.)))**

panel cited evidence of coordination between the Alabama Democratic Party and the Alabama Democratic Conference PAC in holding that the state may be able to justify the application of a contribution limitation. But even so, the logic of *Citizens United* would insist on the enforcement of bans on coordination, rather than targeting an entire class of contributions to independent groups. *Citizens United* did not treat corruption as a fact question to be resolved on a case-by-case basis. Instead, the Court considered whether *independent speech* is the type that poses a risk of *quid pro quo* corruption or the appearance thereof. *See Citizens United,* 558 U.S. at 360, 130 S.Ct. 876. The Court determined that speech through independent expenditures does not pose such a risk. But it did not question the government's authority to enforce restrictions against coordination between candidates and independent expenditure PACs—coordination breaks the essential independence of the expenditure and has always been deemed the functional equivalent of a candidate contribution. *Id.*

FN5. The federal aggregate limitations are currently subject to a challenge in the Supreme Court in *McCutcheon v. FEC,* No. 12–536 (U.S. argued Oct. 8, 2013).

FN6. In responding to Justice Kennedy's dissent arguing a narrow view of corruption, the *McConnell* majority upheld BCRA's restriction on soft money contributions to political parties, stating,

[I]n [ *Cal–Med* ], we upheld FECA's $5,000 limit on contributions to multicandidate political committees. It is no answer to say that such limits were justified as a means of preventing individuals from using parties and political committees as

pass-throughs to circumvent FECA's $1,000 limit on individual contributions to candidates. Given FECA's definition of 'contribution,' the $5,000 and $25,000 limits restricted not only the source and amount of funds available to parties and political committees to make candidate contributions, but also the source and amount of funds available to engage in express advocacy and numerous other noncoordinated expenditures. If indeed the First Amendment prohibited Congress from regulating contributions to fund the latter, the otherwise-easy-to-remedy exploitation of parties as pass-throughs (e.g., a strict limit on donations that could be used to fund candidate contributions) would have provided insufficient justification for such overbroad legislation.

540 U.S. at 152 n. 48, 124 S.Ct. 619.

FN7. New Mexico's interpretation of footnote 48 also threatens to upend the longstanding *Buckley* framework. If a contribution to outside groups for the purpose of making independent expenditures implicates the government's anti-corruption interest, then the same interest is implicated by the independent expenditures themselves. This would mean that "the entire *Buckley* edifice, built on a foundation of a contribution-expenditure dichotomy, falls." Richard L. Hasen, *Buckley Is Dead, Long Live Buckley: The New Campaign Finance Incoherence of McConnell v. Federal Election Commission,* 153 U. Pa. L.Rev. 31, 70 (2004). "Is that what the Court really intended buried in a few sentences of a footnote in one of the longest cases in Supreme Court history?" *Id.; see also Emily's List,* 581 F.3d at 14 n. 13 (declining to adopt expansive reading of footnote 48).

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.3d ----, 2013 WL 6645428 (C.A.10 (N.M.))
**(Cite as: 2013 WL 6645428 (C.A.10 (N.M.)))**

FN8. We recognize, of course, that candidates are no doubt grateful for the support of independent groups, but as we point out above, *Citizens United* held that "ingratiation and access ... are not corruption." 558 U.S. at 310, 130 S.Ct. 876. For an interpretation of independent expenditures supported by the Press Clause of the First Amendment that avoids this difficulty, *see* Michael W. McConnell, *Reconsidering Citizens United as a Press Clause Case,* 123 Yale L.J. 412 (2013) (concluding *Citizens United*'s non-corruption explanation is overall unconvincing and made the decision appear "naïve or obtuse").

FN9. The FEC distinguishes independent expenditures from coordinated contributions under the following regulation:

(a) The term independent expenditure means an expenditure by a person for a communication expressly advocating the election or defeat of a clearly identified candidate that is not made in cooperation, consultation, or concert with, or at the request or suggestion of, a candidate, a candidate's authorized committee, or their agents, or a political party committee or its agents.

....

(c) No expenditure shall be considered independent if the person making the expenditure allows a candidate, a candidate's authorized committee, or their agents, or a political party committee or its agents to become materially involved in decisions regarding the communication....

11 C.F.R. § 100.16 (2013).

FN10. *Stop This Insanity* conflicts with *Carey,* another case from the same district court. *Carey* endorses the concept a single entity may make both candidate contributions and independent expenditures from segregated accounts. *See* 791 F.Supp.2d at 130–32. The FEC, for now, also endorses that approach:

The Commission will no longer enforce 2 U.S.C. §§ 441a(a)(1)(C) and 441a(a)(3), as well as any implementing regulations, against any nonconnected political committee with regard to contributions from individuals, political committees, corporations, and labor organizations, as long as (1) the committee deposits the contributions into a separate bank account for the purpose of financing independent expenditures, other advertisements that refer to a Federal candidate, and generic voter drives (the "Non–Contribution Account"), (2) the Non–Contribution Account remains segregated from any accounts that receive source-restricted and amount-limited contributions for the purpose of making contributions to candidates, and (3) each account pays a percentage of administrative expenses that closely corresponds to the percentage of activity for that account.

*FEC Statement on Carey v. FEC, Reporting Guidance for Political Committees that Maintain a Non–Contribution Account* (Oct. 5, 2011), http://www.fec.gov/press/Press2011/20111006postcarey.shtml.

FN11. In *Alabama Democratic Conference*, an Eleventh Circuit panel suggested that hy-

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.3d ----, 2013 WL 6645428 (C.A.10 (N.M.))
**(Cite as: 2013 WL 6645428 (C.A.10 (N.M.)))**

brid PACs could pose a unique risk of circumvention of individual contribution limits. A supporter of a particular candidate may donate to a hybrid PAC's independent expenditure account while extracting a promise from the PAC to donate to a particular candidate from its hard-money account. 2013 WL 5273304, at *2. The potential that a large donor may extract a promise that the PAC will contribute to a particular candidate, however, concerns only the control over the PAC's agenda. It does not affect the funds available in the PAC's hard-money account, which is subject to strict restrictions on the amount it may raise from a single donor and contribute to single candidate. This scenario would not result in circumvention of individual contribution limits.

FN12. For example, Chris Collins is listed as the treasurer of NMER on its registration form with the New Mexico Secretary of State, Aplt.App. 60, and he attests to this fact in the Plaintiffs' verified pleadings, *id.* at 39–40. In a separate part of the same verified pleadings, Collins also declares that he is the chairman of the Republican Party of Bernalillo County. *Id.* at 35–36. In their complaint, Plaintiffs admit that NMER was "organized by" NM–GOP but insist that it "operates completely independently of the NM–GOP, candidates, officeholders, NM–GOP officers and staff, NM–GOP's Executive Committee, and the NM–GOP chairman." *Id.* at 22.

C.A.10 (N.M.),2013.
Republican Party of New Mexico v. King
--- F.3d ----, 2013 WL 6645428 (C.A.10 (N.M.))

END OF DOCUMENT

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Westlaw

Page 1

Not Reported in F.Supp.2d, 2012 WL 3263623 (S.D.W.Va.)
**(Cite as: 2012 WL 3263623 (S.D.W.Va.))**

H
Only the Westlaw citation is currently available.

United States District Court,
S.D. West Virginia,
Bluefield Division.
STAY THE COURSE WEST VIRGINIA, et al.,
Plaintiffs,
v.
Natalie E. TENNANT, et al., Defendants.

Civil Action No. 1:12–cv–01658.
Aug. 9, 2012.

Allen R. Prunty, W. Bradley Sorrells, Robinson &
McElwee, Charleston, WV, for Plaintiffs.

Doren Burrell, Office of the Attorney General,
Charleston, WV, for Defendants.

### MEMORANDUM OPINION AND ORDER

THOMAS E. JOHNSTON, District Judge.

*1 Pending before the Court are the following
motions filed by Plaintiffs Stay the Course West Vir-
ginia, Pineville Lumber, Inc., David Bailey, and
Thomas Stephen Bailey ("Plaintiffs"): (1) Motion for
Class Certification [Docket 3]; (2) Motion for Pre-
liminary Injunction [Docket 15]; and (3) Motion for
Expedited Consideration of Class Certification Mo-
tion [Docket 18]. For the reasons stated below, the
Motion for Preliminary Injunction [Docket 15] is
**GRANTED.** The Court finds it unnecessary to rule on
the motion for class certification at this time, finding
that injunctive relief will adequately protect the in-
terests of the plaintiffs at this juncture of the case.

### I. FACTUAL BACKGROUND & PROCEDURAL HISTORY

Plaintiffs in this case are: (1) Stay the Course
West Virginia ("STCWV"), an independent expendi-
ture political action committee ("PAC") that is not
affiliated with any candidate for office or political
party; (2) David Bailey, the chairman and treasurer of
STCWV; (3) Pineville Lumber, Inc., a West Virginia
corporation seeking to contribute money to STCWV;
and (4) Thomas Stephen Bailey, an individual seeking
to contribute money to STCWV. (Docket 1 at 3–4 .)
Defendants are West Virginia Secretary of State Na-
talie Tennant and Mercer County Prosecuting Attor-
ney Scott Ash, named "as a representative of the class
of all West Virginia Prosecuting Attorneys." (*Id.* at 1,
4.) Plaintiffs have requested that the prosecuting at-
torneys for West Virginia be certified as a defendant
class pursuant to Rule 23 of the Federal Rules of Civil
Procedure. (Docket 3.) The Court finds it unnecessary
to rule on the motion for class certification at this time,
finding that injunctive relief directed to the named
Defendants will adequately protect the interests of
Plaintiffs at this juncture of the case. *See West Vir-
ginians for Life, Inc. v. Smith,* 919 F.Supp. 954,
955–56 (S.D.W.Va.1996) (reaching same conclu-
sion).

STCWV was organized with the sole purpose of
soliciting and receiving contributions to make inde-
pendent expenditures with respect to the 2012 general
election cycle. (Docket 1 at 4.) Under West Virginia's
election code, an "independent expenditure" is any
expenditure "[e]xpressly advocating the election or
defeat of a clearly identified candidate ... not made in
concert or cooperation with or at the request or sug-
gestion of such candidate, his or her agents, the can-
didates authorized political committee or a political
party committee or its agents." W. Va.Code §
3–8–1a(15). STCWV has as its goal to support busi-
ness-friendly incumbent candidates for statewide
office and to oppose challenger-candidates. (Docket 1
at 4; Docket 1–2 at 8.) STCWV is not affiliated with

Not Reported in F.Supp.2d, 2012 WL 3263623 (S.D.W.Va.)
**(Cite as: 2012 WL 3263623 (S.D.W.Va.))**

any candidate, political party, or candidate or party committee; it is an independent PAC seeking to promote its own agenda. Pineville Lumber is a West Virginia corporation seeking to contribute $5,000 to STCWV. (Docket 1 at 3.) Thomas Bailey is a West Virginia resident seeking to contribute $1,200 to STCWV. (*Id.*) David Bailey is the chairman of STCWV, and he wishes to solicit contributions in excess of $1,000. (*Id.*) The President of Pineville Lumber and both Baileys have submitted affidavits indicating their desire to engage in this activity but expressing their concern that such actions would subject them to criminal penalties under West Virginia law. (Docket 1–2 at 7–14.) Currently, the election code imposes criminal penalties for either: (1) making a contribution in excess of $1,000 "in connection with or on behalf of any person engaged in furthering, advancing, supporting or aiding the nomination or election of any candidate for any of the offices," W. Va.Code § 3–8–12(f); or (2) accepting, as a PAC, "contributions totaling more than $1,000 from any one person prior to the primary election and contributions totaling more than $1,000 from any one person after the primary and before the general election," § 3–8–12(g).

**\*2** According to Plaintiffs, in the wake of *Citizens United v. FEC,* 599 U.S. ——, 130 S.Ct. 876 (2010), West Virginia's $1,000 contribution limit is unconstitutional as applied to independent expenditure PACs, such as STCWV. (Docket 16 at 6–8.) Their rationale is that *Citizens United* held that no government interest sufficiently justifies limitations on corporate or PAC independent expenditures, so there can be no government interest sufficient to limit contributions to independent expenditure PACs, either. (*Id.*) Secretary Tennant responds that there is indeed an anti-corruption interest at play in West Virginia's election code, and she argues that such interest is sufficient to uphold the contribution limit as applied to independent expenditure PACs such as STCWV. (Docket 21 at 5–7.) Notably, Secretary Tennant dedicates a large portion of her response brief to a recita-

tion of the circumstances under which the Supreme Court heard and decided *Caperton v. A.T. Massey Coal Co.,* 556 U.S. 868 (2009).

In the complaint, Plaintiffs challenge several provisions of West Virginia law, making three overall arguments. First, Plaintiffs challenge West Virginia Code of State Rules §§ 146–1–3.1, 146–1–3.2, and 146–1–6.2 as in conflict with West Virginia Code § 3–8–8(a) & (b). The statute prohibits corporate contributions to "any candidate or candidate's campaign," but the regulations purport to prohibit corporations from making "a[ny] contribution or expenditure ... whatsoever in connection with" a campaign. Obviously, the regulations reach a broader swath of political speech, and Plaintiffs challenge them as inconsistent with statute and constitutional law. In her answer, Secretary Tennant admits that to the extent the regulations conflict with Code § 3–8–8, the statute controls and the regulations are unenforceable. (Docket 11 at 6.) The first challenge is therefore moot.

Second, Plaintiffs challenge a manual issued by Secretary Tennant, entitled "2012 Running for Office in West Virginia," as violating West Virginia Code § 3–8–2(b). The statute permits independent expenditures by corporations for the purpose of expressly advocating the election or defeat of a candidate for political office. However, the manual is at odds with the statute, stating that corporations may not make direct expenditures to support or oppose candidates for statewide office. In her answer to Plaintiffs' complaint, Secretary Tennant states that the manual is "provided as information for the public and not intended as [a] statement[ ] of policy." (Docket 11 at 4.) The second challenge is therefore moot.

Finally, Plaintiffs challenge several subsections of West Virginia Code § 3–8–12, as well as § 146–3–5.2 of the Code of State Rules, all of which prohibit individuals (and corporations by virtue of the election code's definitions) from contributing more than $1,000 to PACs and PACs from accepting such

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2012 WL 3263623 (S.D.W.Va.)
**(Cite as: 2012 WL 3263623 (S.D.W.Va.))**

contributions in excess of $1,000. Specifically, the challenged statute provides as follows:

**\*3** (f) Except as provided in section eight of this article, *a person may not, directly or indirectly, make any contribution in excess of the value of $1,000* in connection with any campaign for nomination or election to or on behalf of any statewide office, in connection with any other campaign for nomination or election to or on behalf of any other elective office in the state or any of its subdivisions, or *in connection with or on behalf of any person engaged in furthering, advancing, supporting or aiding the nomination or election of any candidate for any of the offices.*

(g) A political organization (as defined in Section 527(e)(1) of the Internal Revenue Code of 1986)[PAC] may not solicit or accept contributions until it has notified the Secretary of State of its existence and of the purposes for which it was formed. During the two-year election cycle, *a [PAC] may not accept contributions totaling more than $1,000 from any one person prior to the primary election and contributions totaling more than $1,000 from any one person after the primary and before the general election.*

....

(n) Any person violating any provision of this section is guilty of a misdemeanor and, upon conviction thereof, shall be fined not more than $1,000, or confined in jail for not more than one year, or, both fined and confined.

....

(p) The limitations on contributions established by subsection (g) of this section do not apply to contributions made for the purpose of supporting or opposing a ballot issue, including a constitutional amendment.

W. Va.Code § 3–8–12 (emphasis added).

Although Plaintiffs will ultimately seek a declaratory judgment from this Court, they currently seek only a preliminary injunction to preclude the enforcement of § 3–8–12. Plaintiffs and Secretary Tennant appeared before the Court by counsel on August 1, 2012, to argue the pending motions. (Docket 24.)

*II. PRELIMINARY INJUNCTION STANDARD*

A preliminary injunction is an extraordinary remedy never awarded as of right. In each case, the Court must balance the competing claims of injury and consider the effect of granting or withholding the requested relief, paying particular regard to the public consequences. *Weinberger v. Romero–Barcelo,* 456 U.S. 305 (1982).

"A plaintiff seeking a preliminary injunction must establish [1] that he is likely to succeed on the merits, [2] that he is likely to suffer irreparable harm in the absence of preliminary relief, [3] that the balance of equities tips in his favor, and [4] that an injunction is in the public interest." *Winter v. Natural Res. Def. Council, Inc.,* 555 U.S. 7, 20 (2008) (citing *Munaf v. Geren,* 553 U.S. 674, 689–90 (2008)). The plaintiff must demonstrate a *likelihood* of irreparable harm without a preliminary injunction; a mere *possibility* of harm will not suffice. *Id.* at 21. And "[i]n exercising their sound discretion, courts of equity should pay particular regard for the public consequences in employing the extraordinary remedy of injunction." *Romero–Barcelo,* 456 U.S. at 312.

**\*4** Regarding likelihood of success, prior law in the Fourth Circuit was that there is a " 'flexible interplay' among all the factors considered ... for all four [factors] are intertwined and each affects in degree all the others." *Blackwelder Furniture Co. of Statesville v. Seilig Mfg. Co.,* 550 F.2d 189, 196 (4th Cir.1977)

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2012 WL 3263623 (S.D.W.Va.)
**(Cite as: 2012 WL 3263623 (S.D.W.Va.))**

(citations omitted). Accordingly, plaintiffs were not strictly required to demonstrate likelihood of success on the merits; rather, "it [was] enough that grave or serious questions on the merits are presented." *Id.* But in the wake of the Supreme Court decision in *Winter v. NRDC,* the *Blackwelder* balancing approach "may no longer be applied in granting or denying preliminary injunctions in the Fourth Circuit." *Real Truth About Obama, Inc. v. FEC,* 575 F.3d 342, 347 (4th Cir.2009) (*RTAO I* ), *vacated on other grounds,* 130 S.Ct. 2371 (2010) *and adhered to in part sub nom. Real Truth About Obama, Inc. v. FEC,* 607 F.3d 355 (4th Cir.2010) (*RTAO II* ). Instead, the Fourth Circuit has held that a party seeking the preliminary injunction must demonstrate by "a clear showing that it is likely to succeed at trial on the merits." *RTAO I, 575 F.3d at 351.* The Fourth Circuit has not expressly required that a movant prove success on the merits is "more likely than not" in order to meet the requirement of a clear showing, but the new requirement "is far stricter than the *Blackwelder* requirement that the plaintiff demonstrate only a grave or serious question for litigation." *Id.* at 345–46.

### III. DISCUSSION

*A. Likelihood of Success on the Merits*

Plaintiffs argue that they are likely to succeed in their as-applied First Amendment challenge to West Virginia Code § 3–8–12 because a logical extension of *Citizens United* prohibits any limitation on monetary contributions to independent expenditure PACs. (Docket 16 at 5–7.) Secretary Tennant responds that West Virginia's contribution limit withstands constitutional scrutiny in this case as a valid effort by the Legislature to combat corruption and the appearance of corruption in statewide elections. (Docket 21 at 2–5.)

Since *Buckley v. Valeo,* the Supreme Court has distinguished between restrictions on political contributions and restrictions on expenditures for political speech. 424 U.S. 1, 15 (1976). Although limitations on campaign contributions "operate in an area of the most

fundamental First Amendment activities," they generally entail "only a marginal restriction upon the contributor's ability to engage in free communication." *Id.* at 15, 20. Consequently, courts considering the validity of contribution limitations should apply "closely drawn scrutiny," which asks whether the law is "closely drawn" to match a "sufficiently important government interest." *Randall v. Sorrell,* 548 U.S. 230, 247 (2006) (citing *Buckley,* 424 U.S. at 25). Although the Buckley Court upheld the contribution limitations at issue in that case, it recognized that "contribution restrictions could have a severe impact on political dialogue if the limitations prevented candidates and political committees from amassing the resources necessary for effective advocacy." 424 U.S. at 24.

**\*5** To determine whether West Virginia's contribution limitation survives "closely drawn scrutiny," the Court first endeavors to identify a "sufficiently important government interest" at play in the statute. In *Citizens United,* the Supreme Court determined that there exists only one government interest sufficiently important to outweigh the First Amendment interests implicated by contributions for political speech: preventing corruption or the appearance of corruption. *See* 130 S.Ct. at 904–08, 911 (considering and rejecting other asserted government interests); *see also Davis v. FEC,* 554 U.S. 724, 740–41 & n. 7 (2008) (rejecting so-called "anti-distortion rationale"). And the *Citizens United Court,* although dealing with expenditures rather than contributions, squarely held that the government has no anti-corruption interest in limiting independent expenditures. *Id* . at 909–10. Specifically, the Court rejected a provision of the Bipartisan Campaign Reform Act of 2002 that made it unlawful for any corporation or union to use general treasury funds to make independent expenditures or expenditures for "electioneering communications," which are defined as political ads airing shortly before a general or primary election. *Id.* at 897, 911. The Supreme Court declared the expenditure ban unconstitutional, holding "that corporations may not be

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2012 WL 3263623 (S.D.W.Va.)
**(Cite as: 2012 WL 3263623 (S.D.W.Va.))**

prohibited from spending money for express political advocacy when those expenditures are independent from candidates and uncoordinated with their campaigns." *SpeechNow.org v. FEC,* 599 F.3d 686, 693 (D.C.Cir.2010) (summarizing *Citizens United* decision). In no uncertain terms, the *Citizens United* Court stated: "[W]e now conclude that independent expenditures, including those made by corporations, do not give rise to corruption or the appearance of corruption." 130 S.Ct. at 909.

From this holding, the D.C. Circuit, since joined by the Seventh and Ninth Circuits, has held that "because *Citizens United* holds that independent expenditures do not corrupt or give the appearance of corruption as a matter of law, then the government can have no anti-corruption interest in limiting contributions to independent expenditure-only organizations.... [T]he limits on contributions to [independent expenditure PACs] cannot stand." *SpeechNow,* 599 F.3d at 696; *see also Wis. Right to Life State PAC v. Barland,* 664 F.3d 139, 154 (7th Cir.2011) ("[A]s a matter of law and logic, Wisconsin's ... contribution limit is unconstitutional as applied to ... [independent expenditure PACs]. This is true even though the statute limits contributions, not expenditures. Whether strict scrutiny or the intermediate 'closely drawn' standard applies, the anticorruption rationale cannot serve as a justification for limiting fundraising by groups that engage in independent spending on political speech. No other justification for limits on political speech has been recognized, and none is offered here."); *Long Beach Area Chamber of Commerce v. Long Beach,* 603 F.3d 684, 696–98 (9th Cir.2010) (rejecting government's proffered interests in similar contribution limits).

**\*6** The Fourth Circuit reached this same conclusion, although in a pre-*Citizens United* decision. The relevant excerpt speaks for itself:

Importantly, however, the [Supreme] Court has never held that it is constitutional to apply contri-

bution limits to political committees that make solely independent expenditures. In fact, Justice Blackmun stressed in his *Cal–Med* concurrence that "contributions to a committee that makes only independent expenditures pose no ... threat" of corruption or the appearance thereof. *See Cal. Med. Ass 'n v. FEC,* 453 U.S. 182, 203 (1981) (Blackmun, J., concurring). This makes perfect sense: independent expenditures are made without candidate consultation, rendering it unlikely that such expenditures would be made in exchange for "improper commitments from the candidate." *Buckley,* 424 U.S. at 47 (noting that "independent expenditures may well provide little assistance to the candidate's campaign and indeed may prove counterproductive").

Moreover, *McConnell* specifically emphasized the difference between political parties and independent expenditure political committees, which explains why contribution limits are acceptable when applied to the former, but unacceptable when applied to the latter. To begin, the Court noted that independent expenditure committees "do not select slates of candidates for elections," "determine who will serve on legislative committees, elect congressional leadership, or organize legislative caucuses." *McConnell v. FEC,* 540 U.S. 93, 188 (2003). Conversely, "[p]olitical parties have influence and power in the Legislature that vastly exceeds that of any interest group." *Id.* Furthermore, "party affiliation is the primary way ... voters identify candidates," and therefore parties "have special access to and relationships with" those who hold public office. *Id.* It is thus not an exaggeration to say that *McConnell* views political parties as different in kind than independent expenditure committees.

Thus, while the state's power to impose contribution limits is well-established, that power exists only when the contribution limits are "closely drawn" to the state's interest in preventing corruption. As the state attempts to regulate entities further and further

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2012 WL 3263623 (S.D.W.Va.)
**(Cite as: 2012 WL 3263623 (S.D.W.Va.))**

removed from the candidate, the state interest in preventing corruption necessarily decreases. At the extreme, the entities furthest removed from the candidate are political committees that make solely independent expenditures. As such, it is "implausible" that contributions to independent expenditure political committees are corrupting. *N.C. Right to Life, Inc. v. Leake,* 344 F.3d 418, 434 (2003).

*N.C. Right to Life, Inc. v. Leake,* 525 F.3d 274, 292–93 (2008).

The Seventh Circuit aptly explained how this conclusion, now reached by four courts of appeals, short-circuits such laws and simplifies the Court's analysis: "Without an anticorruption rationale, the government [is] left empty-handed; ... as applied to independent expenditure groups, the ... contribution limit [is] unjustified under [any standard of review] because 'something ... outweighs nothing every time.' " *Borland,* 664 F.3d at 154 (quoting *SpeechNow,* 599 F.3d at 695). In other words, the Court need go no further. The government has no interest in maintaining the contribution limit as applied to Plaintiffs, and Plaintiffs certainly have some level of First Amendment interest in soliciting, receiving, and making contributions for independent expenditures. The Court therefore **FINDS** that Plaintiffs are very likely to succeed in their as-applied challenge to § 3–8–12 of the West Virginia Code.

*B. Likelihood of Suffering Irreparable Harm*
**\*7** Plaintiffs assert that they are likely to suffer irreparable harm without the entry of a preliminary injunction, citing the loss of First Amendment freedoms as per se irreparable harm. (Docket 16 at 7–8.) Secretary Tennant responds that, even if they are likely to succeed on the merits, Plaintiffs are unlikely to suffer any real harm without a preliminary injunction. (Docket 21 at 4.) She reasons that "[t]he West Virginia law does not block the Plaintiffs' ability to show support for, or opposition to, one or more candidates in the upcoming election," and they will

therefore suffer no harm from enforcing the contribution limit. (*Id.*) The Court disagrees.

"The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Legend Night Club v. Miller,* 637 F.3d 291, 302 (4th Cir.2011) (quoting *Elrod v. Burns,* 427 U.S. 347, 373 (1976) (plurality opinion)). And "monetary damages are inadequate to compensate for the loss of First Amendment freedoms." *Id.* (citing *Joelner v. Vill. of Wash. Park,* 378 F.3d 613, 620 (7th Cir.2004)). It is a "cardinal tenet" of the Supreme Court's campaign finance jurisprudence that political spending is constitutionally protected speech. *See Emily's List v. FEC,* 581 F.3d 1, 5 (D.C.Cir.2009). More particularly, contribution limitations encroach upon First Amendment liberties because they "entail[ ] ... restriction upon the contributor's ability to engage in free communication." *Buckley,* 424 U.S. at 20. Contributions "permit[ ] the symbolic expression of support," and they therefore fall within the realm of First Amendment protection. *Id.* at 21. To address the Secretary's response, the availability to Plaintiffs of other, less effective means of political expression does not entitle the State of West Virginia to foreclose Plaintiffs' First Amendment right to pool their resources for the purpose of making concerted independent expenditures. Accordingly, the Court **FINDS** that Plaintiffs are likely to suffer irreparable injury to their First Amendment rights absent an injunction.

*C. Balance of Equities*
As to the third preliminary injunction factor, Secretary Tennant argues that, on balance, West Virginia's interest in maintaining the integrity of its elections by eliminating actual and perceived corruption in elections outweighs any First Amendment interest Plaintiffs have in making contributions to independent expenditure PACs. (Docket 21 at 4–5.) As set forth above, West Virginia Code § 3–8–12 serves no anti-corruption interest. Thus, the Secretary's perceived harm to the State of West Virginia is illusory, and the balance of equities favors Plaintiffs' free speech rights.

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2012 WL 3263623 (S.D.W.Va.)
**(Cite as: 2012 WL 3263623 (S.D.W.Va.))**

Further, the State of West Virginia is "in no way harmed by issuance of an injunction that prevents the state from enforcing unconstitutional restrictions." *Legend Night Club,* 637 F.3d at 302–03 (citing *Joelner,* 378 F.3d at 620). The Court **FINDS** that the balance of equities tips decidedly in favor of issuing a preliminary injunction.

*D. Public Interest*

   **\*8** Finally, there is a significant public interest in upholding the free speech principles that are integral to our democratic society. Secretary Tennant argues that the state's interest in maintaining the legitimacy of its statewide elections is also in the public interest, and it justifies the burdens placed on Plaintiffs by the challenged statute. (Docket 21 at 5–6.) She relies a great deal on the *Caperton* decision to illustrate bias in West Virginia elections. However, *Caperton* dealt with the Fourteenth Amendment and recusal rules, not the First Amendment's free speech guarantees. *See Citizens United,* 130 S.Ct. at 910 (distinguishing *Caperton* ). Moreover, while ensuring the integrity of elections may be in the public interest, application of the statute at issue to independent expenditure PACs such as STCWV and its contributors does not further that goal. The Court **FINDS** that issuance of a preliminary injunction will serve the public interest.

### IV. CONCLUSION

   For the reasons stated above, Plaintiffs are likely to succeed on the merits of their challenge to West Virginia Code § 3–8–12 and the corresponding regulations. Further, the balance of harms tips decidedly in favor of Plaintiffs and according them relief would serve the public interest. They are entitled to a preliminary injunction, and the Motion for Preliminary Injunction [Docket 15] is hereby **GRANTED.** A separate Preliminary Injunction Order will enter this day implementing the ruling contained in this opinion.

   **IT IS SO ORDERED.**

   The Court **DIRECTS** the Clerk to send a copy of this Order to counsel of record and any unrepresented party.

S.D.W.Va.,2012.
Stay the Course West Virginia v. Tennant
Not Reported in F.Supp.2d, 2012 WL 3263623 (S.D.W.Va.)

END OF DOCUMENT

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.